*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EVERETT CHATTMAN,

                   *Plaintiff-Appellant,*

    *v.*

                 No. 10-5306

TOHO TENAX AMERICA, INC,

                *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 08-00454—Thomas A. Varlan, District Judge.

Argued: June 9, 2011

Decided and Filed:  July 13, 2012

Before:  WHITE and STRANCH, Circuit Judges; and COHN, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Mark N. Foster, LAW OFFICE OF MARK N. FOSTER, Rockwood, Tennessee, for Appellant.   Teresa Rider Bult, CONSTANGY, BROOKS & SMITH, Nashville, Tennessee, for Appellee. **ON BRIEF:** Mark N. Foster, LAW OFFICE OF MARK N. FOSTER, Rockwood, Tennessee, for Appellant.   Teresa Rider Bult, CONSTANGY, BROOKS & SMITH, Nashville, Tennessee, for Appellee.

_____

### OPINION

_____

    JANE B. STRANCH, Circuit Judge.   Everett Chattman appeals the district court's grant of summary judgment to his employer on his claims of racial

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

discrimination.    Following recent Supreme Court precedent, we **REVERSE** and **REMAND** for trial.

## I.  BACKGROUND

### A.     Factual Background

It is undisputed that Plaintiff-Appellant Everett "Sly" Chattman had been an able employee at the Rockwood, Tennessee plant of Defendant-Appellee Toho Tenax America, Inc. ("Toho") for 20 years at the time the events giving rise to this litigation took place.  During the relevant time period, Chattman, an African American, worked as a shipping coordinator.  Chattman alleges that Jeff Tullock, a Caucasian and then Human Resources Director at the Rockwood facility, harbored racial bias against African Americans, including Chattman himself.  Chattman alleges Tullock's racial animus motivated Tullock's recommendation that upper management terminate Chattman's employment following an incident of horseplay.

Chattman offers three incidents in which Tullock made racial comments as evidence of his animosity toward African Americans.  In the Spring of 2007, Tullock told a "joke" that O.J. Simpson was innocent and that Nicole Brown was killed by their son because O.J. Simpson responded to a question from his son by answering "go axe your mother."  Around February 2008, Tullock responded to another employee's complaint that her son had gotten into trouble at school for fighting by saying "you know what my grandmother always says about boys scuffling? That's how the nigger graveyard got full."  A few days later, Tullock commented about then-Presidential-candidate Barack Obama by saying "well you better look close at Obama's running mate because Americans won't allow a nigger president."

On October 2, 2007, Chattman and a Caucasian coworker, Frank Johnson, engaged in horseplay on the facility floor.  According to Chattman, he asked Johnson to help move some boxes to another area.  Johnson reacted by joking with Chattman that "you are not my damn boss."  Chattman then bear-hugged Johnson and told him to help, released him, and both began laughing.  Johnson subsequently went to the hospital to be

examined and filed an incident report for workers' compensation purposes. Chattman alleges he thought nothing of this incident, as he and his coworkers commonly engaged in this type of horseplay.

Later on the same day, Chattman was called to a meeting with Tullock, Toho's Vice President of Operations, Ben Chandler, and Chattman's immediate supervisor, Scottie Smith. Tullock informed Chattman that Johnson had said Chattman body-slammed him. Tullock also stated he had received written statements from two witnesses confirming the attack.[1] Tullock and Chandler immediately suspended Chattman pending a full investigation of the incident.[2]

From this point forward, Tullock appears to have misinformed various members of upper management about the investigation process. For example, Chandler, in his deposition, stated that he, Tullock, and Smith discussed what to do about the incident and agreed not to make any decision or recommendation until after speaking to someone at the corporation's Human Resources and Legal departments. However, after that meeting, Tullock called Jeff Lane, Vice President of Human Resources at Toho's parent company, and recommended Chattman be terminated. In his deposition, Tullock recalled telling Lane that "Ben [Chandler] and I were both recommending termination and Scotty [Smith] as well." Chandler and Smith both deny they recommended termination.[3]

Further, according to Lane's deposition testimony, he told Tullock to conduct a full investigation, suggesting no final decision had been made as to disciplining Chattman. However, Tullock told Verbruggen in a subsequent e-mail that he had spoken

---

[1]In Chandler's deposition, he testified that the two witnesses did not actually corroborate Johnson's story as far as the body-slamming.

[2]Chattman returned to work on October 9, 2007 and was paid for the work hours he missed due to the suspension.

[3]Smith, in his declaration, states that he was never asked to make a recommendation and did not give one. However, he later opined to Chandler that he should not fire Chattman over this incident. Chandler, in his deposition, stated that given the information he had at the time he would have recommended termination, but that he did not do so because he was waiting for input from Lane and the corporate legal department.

to Lane and that Lane had agreed to terminate Chattman during their phone conversation.

Connie Jackson, Toho's IT Manager, sent Verbruggen an email at the end of the workday on October 2, 2007 to warn Verbruggen of facts she believed important:

> [Y]ou need to know the following. First, horseplay is very common on the plant floor. It is part of the plant culture and this incident is by no means an isolated case. Even if the policy says that horseplay is not tolerated, I believe the accepted practice takes precedence, legally. The fact that Frank [Johnson] claims to be injured makes the result different, but the conduct and the intention are the same as the horseplay that goes on every day. Second, Jeff Tullock has told at least one racial joke, that several members of management overheard, which could bring his motivation into question. And third, Frank has a history of making questionable worker's comp claims and receiving time off and money associated with them. If Sly is fired and he pursues legal action, these facts will be brought out in the discovery phase of the case. This could be very damaging to our company.

(R.28-5, Jackson Email 10/2/2007).

The next day, October 3, 2007, Verbruggen called Lane and told him that Johnson had been telling coworkers differing versions of his story about what happened with Chattman and asked Lane to accompany him to Rockwood to investigate the incident. On October 4, 2007, Lane and Verbruggen interviewed Chattman, Johnson, and the two witnesses. Bothered by the inconsistencies between Johnson's version of the horseplay incident and the versions recounted by the other three, Lane and Verbruggen agreed that Chattman and Johnson both be given a final written warning.[4] According to Toho policy, a final written warning is the corrective action that is taken immediately prior to termination, and it remains active for one year. During that period, the employee is ineligible for promotions. On approximately the 8th or 9th of October, Lane instructed Tullock to prepare a formal written warning for Chattman. Lane

---

[4]Defendant admits that, while Chattman was disciplined for engaging in horseplay, Johnson was not; he was disciplined for exaggerating his injuries and falsely recounting the details of the incident.

concedes, however, that Tullock did not actually do so until December 20, when he completed an "Associate Counseling Notice," back-dated to October 2.

Chattman alleges that the final written warning kept him from receiving a promotion.[5] Smith, Chattman's immediate supervisor, had accepted a position out-of-state, and late in 2007 the Rockwood management began discussing who would take over Smith's supervisory duties. Sometime after the investigation but before December 20, 2007, Smith and another supervisor, Jamie Nelson, agreed that a new shipping supervisor position should be created to cover Smith's duties and that Chattman should be given the position. Smith states that he and Nelson met with Chandler and made their recommendation, and that after that meeting Smith "thought at that point that Chandler had agreed to promote Plaintiff." Smith did not believe at that time that the company was going to discipline, or had disciplined, Chattman for the Johnson incident. Chattman alleges that before Tullock gave him the written warning in December, Chandler told Chattman that he would promote him to a supervisory position "when all this dies down." Tullock's issuance of the final written warning on December 20 made Chattman ineligible for a promotion at that time.

Ultimately, Chandler decided not to create the proposed shipping supervisor position, but instead distributed Smith's duties among existing employees. No applications were ever accepted for such a position. Chandler alleges that Chattman's final written warning had no bearing on his decision not to create the supervisory position. As of the date of oral argument, Chattman remains employed at Toho as a shipping coordinator.

---

[5]Contrary to the district court's finding, Chattman consistently challenged Tullock's motivation and involvement in his suspension and the ultimate decision to issue Chattman a final written warning. Thus, Chattman has not waived this theory of discrimination nor limited himself to a failure-to-promote claim. Any potential nexus between the prior discipline and Chattman's claim of a lost promotion opportunity could be relevant in calculating damages. These are all matters for determination by a jury.

**B.      Procedural History**

Chattman's complaint asserted claims under Title VII and the Tennessee Human Rights Act ("THRA").  After answering, Defendant moved for summary judgment, stating that Chattman had pointed to no adverse employment action taken against him and that, even if such action was taken, Chattman could not prove pretext.

On February 22, 2010, the district court granted Defendant's motion for summary judgment.  Specifically, the district court, addressing Chattman's THRA claim in the context of Title  VII, applied the *McDonnell-Douglas* burden-shifting framework to those claims and found that Chattman had failed to make a prima facie case for failure to promote, and also had failed to prove pretext in the face of Defendant's nondiscriminatory reasons for disciplining him.  Chattman now appeals the district court's grant of summary judgment to Toho on his Title VII and THRA claims, raising a number of alleged errors.[6]  The parties address these claims as if they were one single claim, as the district court did.

## II.  DISCUSSION

**A.      Standard of Review**

This Court reviews the grant of summary judgment de novo.  *Spees v. James Marine, Inc.*, 617 F.3d 380, 388 (6th Cir. 2010).  Summary judgment is appropriate if the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (2010).  The moving party has the burden of proving the absence of a genuine issue of material fact and its entitlement to summary judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

---

[6]Chattman's amended complaint also included a claim under 42 U.S.C. § 1981.  The district court found that proving a prima facie case under § 1981 is even more demanding than under Title VII, and thus Chattman had failed to prove his case under § 1981.  On appeal, Chattman has waived any challenge to the district court's judgment on his § 1981 claim.  His initial appellate brief makes no mention of § 1981. In his reply brief, Chattman states that he did not waive a challenge to the § 1981 ruling, but instead miscited to 42 U.S.C. § 1983 in his initial brief, and this typographical error should not be construed as a waiver.  However, Chattman's initial brief cites to § 1983 only one time, in his jurisdictional statement. This single citation, unaccompanied by any argument, is insufficient to preserve the issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

317, 323 (1986). All facts, including inferences, are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.     Chattman's Title VII and THRA Claims**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U .S.C. § 2000e–2(a)(1). The THRA does so as well. *See* Tenn. Code Ann. § 4–21–401(a)(1); *see also Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims."). Chattman argues he has provided direct evidence that creates a genuine issue of material fact that Tullock was motivated by racial animus when he reported Chattman's horseplay incident and recommended Chattman's termination. Chattman also argues this racial animus can be imputed to Lane and Verbruggen, who ultimately decided to issue Chattman a final written warning.

*1.     Direct Evidence of Racial Discrimination*

An employer becomes liable under Title VII when the plaintiff "establish[es] that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672 (2009) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985-86 (1988)) (internal quotation marks omitted). The plaintiff may show this discriminatory intent through the use of either direct or circumstantial evidence.

Whether a plaintiff's evidence may be properly categorized as direct or circumstantial is of importance, because a direct-evidence claim is removed from the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). Instead, the plaintiff's case-in-chief is met, and "the burden shifts to the employer to

prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

Chattman argues that the district court erred in applying the *McDonnell-Douglas* analysis because he presented direct evidence of Defendant's discriminatory intent. He offers the three racist statements made by Tullock as direct evidence of discrimination. *See supra* at 2. The statements are particularly troubling because they include both racist language and the threat or suggestion of violence or death based on race. No inference is required to gleam from those statements that Tullock harbored racial animus towards African Americans. We have previously held that similar "racist comments" constitute direct evidence of discriminatory intent and Tullock's statements do so here. *See Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1249 (6th Cir. 1995), *overruled on other grounds by Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167 (2009); *Dicarlo*, 358 F.3d at 416 (supervisor's use of slur was direct evidence of national-origin discrimination).[7]

There is some tension in our precedent on the issue of when direct evidence can be based on discriminatory statements that are not temporally proximate to an employment decision. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 525-26 (6th Cir. 2008) (discussing tension), *overruled on other grounds by Gross*, 557 U.S. 167. Subsequent to our holdings in *Talley* and *Dicarlo*, we have held that when managers make age-biased statements outside the context of the decision to discharge the plaintiff, the statements are not direct evidence of age discrimination. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). Even if we assume that these cases are in conflict, we are bound by *Talley* and *DiCarlo*, which were both decided before *Rowan*. *Blair*, 505 F.3d at 526; *see also* 6 Cir. R. 206(c) ("Reported panel opinions are binding on subsequent panels."). However, we need not determine the extent of any

---

[7] The statements in *Talley* and *Dicarlo* were made by decisionmakers, while the statements in this case were made by a nondecisionmaker, Tullock. Whether evidence of Tullock's racial animosity can be imputed Toho will be addressed below.

potential conflict here.  As shown below, even if we analyze Chattman's claims using a circumstantial-evidence test, the claims survive summary judgment.

> 2.     *Circumstantial Evidence of Discrimination*

The three-step framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), guides the analysis of discrimination claims based upon circumstantial evidence.   *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "The burden is first on the plaintiff to demonstrate a prima facie case of race discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext." *Id.*  To make a prima facie case of disparate-treatment discrimination based on disciplinary action, the plaintiff must prove:

> (1) membership in the protected class; (2) that he or she suffered from an adverse action; (3) that he or she was qualified for the position; and (4) that he or she was treated differently from similarly situated members of the unprotected class.

*Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 402-05 (6th Cir. 1999).

### a.     Prima Facie Case

No one disputes that Chattman, an African American, is a member of a protected racial class.  As to the second prong, this Circuit requires a Title VII plaintiff to show that his discipline resulted in "a materially adverse change in the terms of [his] employment." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996).  It is undisputed that a final written warning makes a Toho employee ineligible for promotions or raises for a one-year period.  Before the discipline, Chattman was eligible to be promoted.  After the discipline, he was ineligible.  While it is disputed whether Chattman would have received a promotion during that one-year period but for the warning, the relevant analysis at this point is simply whether the terms of Chattman's employment adversely changed.  They did.

As to the third prong, Defendant has never argued that Chattman was not qualified for the position of shipping coordinator or that Chattman's discipline had anything to do with unsatisfactory job performance. Chattman's twenty-year record of employment without any corrective action would suggest that his performance and qualifications were not questioned.

The fourth prong is the element that Defendant contests and that the district court found dispositive, although both addressed the issue of similar discipline in the context of pretext. To satisfy this element, Chattman bears the burden of proving that white employees, "similar in all of the *relevant* aspects" of employment, were not similarly disciplined. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Id*. Which aspects are to be considered depends on the circumstances of the individual case.

It appears that all discipline at the Rockwood facility went through Tullock as HR Director, and all discipline was subject to the standards set out in the "corrective action" section of the company's manual. The parties dispute whether Chattman's conduct was similar "in all relevant aspects" to the conduct of other white employees who engaged in horseplay but were not disciplined.

Defendant argues that the employees Chattman uses as comparators were not similarly situated, nor were those engaged in horseplay treated any differently than Chattman. As to Chattman's conduct, Defendant asserts that there were no other instances of horseplay which resulted in another employee sustaining a workers' compensation injury, and thus other instances of horseplay were not similar in all relevant aspects. However, Chattman alleges that his conduct was no more severe than that of other, white employees. He alleges that his bear hug of Johnson was in line with the punching and other acts of physical horseplay by white employees that took place on the plant floor, including: giving another employee a wedgie; punching another

employee on multiple occasions, producing a bruise at least once; pretending to run over another employee with a forklift; and grabbing another employee to scare him or joke with him.

As to Johnson's injury and workers' compensation claim, Chattman has also presented evidence that Johnson exaggerated, if not invented, his injury and, therefore, made a false workers' compensation claim. An email from Toho's IT Manager to Verbruggen and the testimony of the two witnesses upon re-interview constitute supporting evidence. Under Chattman's version of the facts, Verbruggen and Lane should have known, by the time they finished their investigation, that Johnson, at best, was exaggerating the severity of the horseplay and his injuries.[8] This knowledge eliminates the "differentiating or mitigating circumstances that would distinguish [Chattman's] conduct" from that of other others engaged in horseplay. *Ercegovich* at 352. Thus, Chattman has created a genuine dispute of material fact as to whether other similarly situated white employees were also similarly disciplined.

### b.      Nondiscriminatory Justification

While the district court found Chattman's failure to make his prima facie case dispositive, it went on to conclude, *arguendo*, that Toho had given a legitimate, nondiscriminatory reason for its discipline of Chattman. Specifically, the district court pointed to Toho's policy, stated in its manual, that termination is an acceptable punishment for a violation of the company's safety rules, of which horseplay is one. This constitutes a sufficient, legitimate reason for the final written warning Chattman was given. *See, e.g.*, *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 549 (6th Cir. 2009) (holding that purportedly violating company's code of conduct is a facially legitimate, nondiscriminatory reason for termination). Because Toho's burden is merely

---

[8]Chattman correctly points out that Johnson's final written warning "is not an example of Defendant's stance towards 'similar' horseplay amongst Defendant's white employees," because Johnson was not disciplined for his horseplay at all, but was instead disciplined for "interfering with Defendant's investigation."

one of production, not persuasion, *Upshaw*, 576 F.3d at 585, Toho has satisfied its burden at this stage of the framework.

### c.       Pretext

Under *Manzer v. Diamond Shamrock Chemicals. Co.*, a plaintiff can establish pretext by showing "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his [discipline], or (3) that they were *insufficient* to motivate discharge." 29 F.3d 1078, 1084 (6th Cir. 1994) (citations omitted). The first category implicates evidence "that the proffered bases for the plaintiff's discharge never happened," and the second category requires that the plaintiff "admit[] the factual basis underlying the employer's proffered explanation and further admit[] that such conduct could motivate dismissal." *Id*. The third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff. *Id*. A showing of the third type of pretext is a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff and, if shown, "permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case." *Id*. In other words, it creates a genuine, triable issue of material fact.

Chattman admits that he engaged in horseplay with Johnson, which belies the first category. Chattman, however, does not admit the factual basis underlying Toho's proffered legitimate reason for his discipline, which eliminates the second category of pretext. Instead, he argues that the horseplay he engaged in was no more severe than other acts of horseplay, and that the severity was exaggerated by Johnson, as confirmed by other employees and known to Toho management at the time of the discipline. Toho has offered no response to Chattman's list of comparable horseplay incidents by white employees that did not result in discipline. Toho instead relies on two key facts: that

Johnson was also disciplined for the incident with Chattman,[9] and that the severity of the Chattman/Johnson incident prompted the discipline because Johnson was injured and a workers' compensation report was filed.

This Court's decision in *Madden v. Chattanooga City Wide Serv. Department*, 549 F.3d 666 (6th Cir. 2008), is instructive in sorting out these competing arguments. There, faced with the employer's argument that the plaintiff's proffers of similar incidents not leading to termination were less severe incidents of misconduct, we focused on both severity and commonality. As to severity of the comparator incidents, we found that the employer "fails to show how the other incidents . . . are any less hazardous than the incident for which [plaintiff] was terminated." *Id.* at 677. Similarly, Toho does not attempt to explain how the other incidents, which included such behavior as "grabbing," "violently attacking," and "punching," are any less severe than Chattman's bear-hugging Johnson.

On commonality, in *Madden*, we relied on the plaintiff's offer of evidence that the use of firecrackers was commonplace at CWS as sufficient evidence to allow the factfinder "to infer that senior managers should have known that fireworks were being used." *Id.* No such inference is even necessary here. Chattman has presented direct evidence that Toho management knew about common incidents of horseplay but failed to act on them. Specifically, in his tape-recorded conversation with Chattman, Tullock admitted he is aware of other incidents of horseplay of comparable severity. In his declaration, Verbruggen acknowledged receiving an email from Toho's IT Manager on the day of the Chattman/Johnson incident informing Verbruggen that horseplay is commonplace and always goes unpunished. Finally, Smith stated that "[d]uring my 13 years of working at Toho, I observed that horseplay is common in Toho's Rockwood facility."

---

[9]This argument fails because, as already noted, Johnson was not disciplined for engaging in horseplay. *See infra* at 4 n.4, 11 n.8.

Based on the above, Chattman has presented a genuine dispute of material fact as to whether employees outside the protected class were not disciplined even though they engaged in similar conduct to that which Toho contends motivated its discipline of Chattman. *Manzer*, 29 F.3d at 1084. Therefore, Chattman has presented a genuine dispute over whether Toho's proffered justification was pretext for racial discrimination.

### 3.     *Cat's-Paw Theory of Liability*

Proof of Tullock's racial animosity toward African Americans does not establish Toho's liability, however, because Tullock was not the decisionmaker with regard to the relevant adverse employment action, Chattman's final written warning. Instead, Lane and Verbruggen made the ultimate decision to discipline Chattman. We have recognized that a plaintiff can show discrimination by offering evidence of a "'causal nexus' between the ultimate decisionmaker's decision to [discipline] the plaintiff and the supervisor's discriminatory animus." *Madden*, 549 F.3d at 677. Plaintiff must show that "[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw." *Id.* at 678 (internal quotation marks omitted).

A recent Supreme Court decision, *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011), published after the district court's decision, elaborated on the cat's paw theory of liability. Its reasoning is dispositive in this case.[10] At issue in *Staub* was a disciplinary warning issued by Staub's supervisor, who was shown to have discriminatory animus toward Staub's military status. *Id.* at 1189. Staub's ultimate termination, although not issued by the discriminatory supervisor, was based on that supervisor's earlier disciplinary warning. *Id.*

---

[10]While Staub dealt with a discrimination claim pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), the Court's reasoning applies with equal force to claims brought under Title VII. Both employ a "motivating factor" standard of causation, 38 U.S.C. § 4311(c); 42 U.S.C. § 2000e-2(m), and the *Staub* Court launched its analysis from a discussion of that phrase, 131 S. Ct. at 1192. *See also Staub*, 131 S. Ct. at 1191 (noting the two statutes are "very similar"); *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (considering *Staub* analysis for a Title VII claim).

The *Staub* Court defined cat's paw liability as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." *Id.* at 1194 (emphasis in original). The Court relied on principles of agency and tort law to impute a lower-level supervisor's discriminatory animus to an otherwise unbiased decisionmaker, thereby rendering the employer liable for the non-decisionmaker's discrimination. *Id.* at 1191-92. If the decisionmaker undertakes an investigation which results in an adverse action for reasons unrelated to the supervisor's original biased action, the employer will not be liable. *Id.* at 1193. However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, *apart from the supervisor's recommendation*, entirely justified." *Id.* (emphasis added). Thus, the Court refused to completely absolve an employer based on its claim to have conducted an independent investigation. *Id.* ("We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect.").

Therefore, under *Staub*, Tullock's racial animus can be imputed to Lane and Verbruggen where Chattman can show (1) Tullock "*intended* . . . to cause an adverse employment action" and (2) Tullock's discriminatory action "is a proximate cause of the ultimate employment action." *Id.* at 1194.

### a.     Tullock's Intent

This element is easily satisfied. Chattman has shown that a genuine issue of material fact exists regarding whether Tullock intended that Chattman be disciplined. Both Smith and Chandler denied making any recommendation about disciplining Chattman for the horseplay incident during their initial meeting with Tullock. Yet, Tullock called Lane and informed him that "Ben [Chandler] and I were both recommending termination and Scotty [Smith] as well." After being told by Lane to conduct a further investigation, but *without* being informed of a disciplinary

determination, Tullock then emailed Verbruggen, claiming that Lane had agreed to terminate Chattman during their phone conversation. Tullock made these recommendations knowing them to be false and notwithstanding the fact that horseplay was common at the plant and several white employees had engaged in horseplay without being terminated.

The *Staub* Court made clear that

[a]nimus and responsibility for the adverse action can both be attributed to the earlier agent [Tullock] if the adverse action is the intended consequence of that agent's discriminatory conduct. So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under [the Act].

131 S. Ct. at 1192. There can be little doubt that Tullock desired Chattman's termination when he made his recommendation and fabricated the agreement of the other supervisors in his communications with Lane and Verbruggen. We do not believe the fact that Chattman was ultimately issued a final written warning rather than terminated alters this or the proximate cause analysis.[11]

### b.     *Proximate Causation*

To survive summary judgment, the second prong of the *Staub* rule requires Chattman to show the existence of a genuine issue of material fact as to whether Tullock's actions were a proximate cause of Chattman's discipline. Cat's paw liability attaches when the biased intermediate employee's actions are "a causal factor of the ultimate employment action." *Staub*, 131 S. Ct. at 1193. The intermediate employee's actions need not be the sole cause of the adverse action; "[t]he decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for

---

[11]The *Staub* Court recognized that it was not presented with the situation where a discriminatory supervisor intends to cause an adverse action and a different adverse action results. *Id.* at 1192 n.2. However, the Court noted that "[u]nder the traditional doctrine of proximate cause, a tortfeasor is sometimes, but not always, liable" is such situations. *Id.* (citing Restatement (Second) Torts §§ 435, 435B & cmt. a). Here, though Tullock desired a greater level of punishment, his actions were a causal factor in the punishment that was issued. "The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact case, an adverse employment decision." *Id.* at 1193.

injuries to have multiple proximate causes." *Id*. at 1192 (citations omitted) (emphasis in original).

An employer will not be liable for its intermediate employee's discrimination if "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action." *Id*. at 1193. However, if the adverse employment action is related to the discriminatory action, the employer may be liable. Neither independent investigation nor independent judgment on the part of the employer provides a *per se* defense.[12] For example, if the intermediate supervisor makes a biased report to the ultimate decisionmaker, it may be a causal factor in the adverse action if the independent investigation by the employer "takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id*. Also, if "the independent investigation relies on facts provided by the biased supervisor," *id*., then the investigation was not, in actuality, independent and the employer is liable.

As Toho points out, *Staub*'s causation analysis is not contrary to the cat's paw case law that already exists in this Circuit. We have previously held that an employer is liable for an intermediate employee's discrimination when there is proof of a "causal nexus" between the discrimination and the adverse action, *Madden*, 549 F.3d at 677, or when the intermediate employee "influences the unbiased decision-maker" to take an adverse action, *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008). To the extent these cases are not inconsistent with *Staub*, we look to them for additional guidance.

Chattman has demonstrated that a genuine issue of material fact exists regarding whether Tullock's actions were a proximate cause of his discipline. In *Madden* we held that the biased supervisor's "discrimination in what information [he] presented to senior managers" was sufficient evidence from which a reasonable factfinder could find

---

[12]To the extent our prior case law holds otherwise, it is overruled by *Staub*. *See, e.g.*, *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir. 1992).

causation. 549 F.3d at 677. Chattman has presented parallel evidence. Like Madden, Chattman alleges that Tullock knew that white employees engaged in horseplay but never reported any of those incidents to upper management, instead reporting the only incident on record of a black employee engaging in horseplay.

In *Ercegovich v. Goodyear Tire & Rubber Co.*, we held that a biased employee's "position [of] influence" is probative of that employee's ability to influence the ultimate decisionmaker. 154 F.3d 344, 355 (6th Cir. 1998). Like the biased supervisor in *Ercegovich*, who was head of retail sales, Tullock's position as Human Resources Director doubtlessly gave him some authority over personnel decisions. Further, Tullock was "involved in some parts of the discussion" regarding Chattman's discipline and non-promotion, a factor the *Ercegovich* Court found indicative of the intermediate employee's influence over the employment decisions. *Id*.

Thus, we cannot say that the investigation conducted by Verbruggen and Lane was "unrelated" to Tullock's actions. Tullock was the Human Resources manager, and he actively inserted himself in the decisionmaking process. He both misinformed and selectively informed Lane and Verbruggen about the incident. A reasonable factfinder could find Tullock's actions were a proximate cause of the adverse decisions.

Because Chattman has presented evidence of Tullock's discriminatory animus and offered sufficient proof under the *Staub* rule to create genuine issues of fact as to intent and causation, this evidence will be imputed to Toho. Thus, summary judgment was improper. The adverse employment actions alleged by Chattman and any damages flowing therefrom are matters to be resolved by a jury.

## III.  CONCLUSION

We **REVERSE** the district court's grant of summary judgment and **REMAND** the case for trial.