**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0678n.06

No. 14-6495

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Oct 07, 2015
DEBORAH S. HUNT, Clerk

RICHARD VELUZAT,                                     )
                                                    )
      **Plaintiff-Appellant,**                     )        ON APPEAL FROM THE
                                                    )        UNITED STATES DISTRICT
v.                                                  )        COURT FOR THE MIDDLE
                                                    )        DISTRICT OF TENNESSEE
WILLIAMSON MEDICAL CENTER,                          )
                                                    )
      **Defendant-Appellee.**                     )        **OPINION**
                                                    )
                                    )

Before:  BATCHELDER, MOORE, and ROGERS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Plaintiff-Appellant Richard Veluzat is a Caucasian male who worked as a pharmacist for Defendant-Appellee Williamson Medical Center ("WMC") for approximately ten years.  Veluzat was terminated from WMC in November 2011.  Veluzat alleges that his termination, as well as the discipline that he faced prior to his termination, was in retaliation for his complaints about racial discrimination towards his co-workers.  The district court granted summary judgment in favor of WMC because Veluzat failed to raise a genuine issue of material fact as to whether WMC's proffered, non-discriminatory reasons were pretextual.  For the reasons discussed below, we **AFFIRM** the district court's grant of summary judgment.

## I.  BACKGROUND

Veluzat began working at WMC in 2001.  R. 47-1 (Veluzat Dep. at 29) (Page ID #548).  According to Veluzat, "everything was great" at WMC from "2001 until 2007."  *Id.*  In 2007,

Janet Nock became Director of Pharmacy. R. 47-2 (Nock Dep. at 13) (Page ID #800). Veluzat believes that Nock "micro-managed" and was "very demanding" to "[m]ost every employee." R. 47-1 (Veluzat Dep. at 110–11) (Page ID #629–30). Veluzat alleges that black and Hispanic employees were treated particularly badly by Nock, and that he "was a special target" of Nock because he "was so close" with minority employees. *Id.* at 116–17 (Page ID #635–36). Veluzat claims that, on several occasions between 2007 and 2011, he expressed concern over the treatment of minority employees to Nock and WMC management.

Veluzat states that in Fall 2007 he was approached by Jackie Sparkman,[1] an African-American pharmacy technician, who complained to Veluzat that Nock was "riding her." *Id.* at 208 (Page ID #727). Veluzat alleges that he subsequently told Nock that "she was being hard" on Sparkman. *Id.* at 209–10 (Page ID #728–29). In Spring 2008, Veluzat claims that he was approached by another African-American pharmacy technician at WMC, Ruby Matthews, who complained that Nock "was constantly treating her like a child, and demeaning her and raising her voice." *Id.* at 211–12 (Page ID #730–31). Veluzat states that Matthews remarked to him that "slavery ended a hundred years ago." *Id.* Veluzat claims that he talked to Nock about Matthews's remarks. *Id.* at 213 (Page ID #732). According to Veluzat, after he expressed Matthews's concerns, Nock remarked that she was "done" with Veluzat. *Id.* at 214 (Page ID #733). Nock claims that Veluzat did not report either of these complaints. R. 47-2 (Nock Dep. at 48, 73–74) (Page ID #835, 860–61).

---

[1]Veluzat's deposition refers to the employee as "Jackie Spartman." *See* R. 47-1 (Veluzat Dep. at 209) (Page ID #728). Other filings, as well as the district court, state her name as "Jackie Sparkman."

Veluzat alleges that in Fall 2009 he was present when Matthews remarked to her co-workers that Nock "doesn't like black people." R. 47-1 (Veluzat Dep. at 219) (Page ID #738). In response, Ysella Torres,[2] an Hispanic pharmacy technician, commented that Nock "doesn't like brown people either, unless they're cleaning her house." *Id.* at 218–19 (Page ID #738–39). Veluzat "felt like that was something that was a little bit more than people should feel in the work environment," so he shared these comments with Steve Pruter, the Assistant Director of Pharmacy. *Id.* at 219 (Page ID #738). Veluzat states that he and Pruter were "good friends" and that they would share their frustrations about Nock to each other. *Id.* at 221 (Page ID #740). Pruter does not recall being told about this incident. R. 35-6 (Pruter Dep. at 22) (Page ID #299). Veluzat did not share these comments with Nock and does not allege that Pruter shared these comments with Nock. R. 47-1 (Veluzat Dep. at 220–21) (Page ID #739–40).

Veluzat also claims that in 2009[3] he was approached by Yvette Bean, an African-American pharmacy technician, who complained to him that Rhonda Demonbreun, a Caucasian co-worker, called her a "black smurf" when she was wearing blue protective clothing at work. *Id.* at 226–27 (Page ID #745–46). Veluzat did not report the incident to Nock, but alleges that he encouraged Bean to report it. *Id.* at 227 (Page ID #746). Nock met with Bean and Demonbreun about the incident. R. 47-2 (Nock Dep. at 40) (Page ID #827).

---

[2]Veluzat's deposition spells this employee's last name as "Torrez," *see, e.g.*, R. 47-1 (Veluzat Dep. at 218–19) (Page ID #738–39), but the parties spell her name "Torres." *See* Appellant Br. at 14; Appellee Br. at 18.

[3]Veluzat first alleged in deposition that Demonbruen called Bean a "black smurf" in 2010. R. 47-1 (Veluzat Dep. at 226) (Page ID #745). He later clarified that the incident happened in 2009. *Id.* at 229–30 (Page ID #748–49).

In August 2009, Veluzat was involved in an informal disciplinary action when he received a "Coaching"—a discussion between an employee and a supervisor that marks an early step of WMC's "Performance Accountability Policy"—by Kim Heath, the hospital's Assistant Clinical Manager. R. 35-8 (Nock Aff. at 1) (Page ID #321); R. 35-1 (Performance Accountability Policy at 2) (Page ID #192). According to Veluzat, the incident arose when he wished to leave his shift for a "quick meeting." R. 35-1 (Aug. 14, 2009 Veluzat Email at 1) (Page ID #208). Demonbreun asked Veluzat whether his meeting was scheduled, because it was not on the calendar. *Id.* Veluzat responded that he "would only be gone for a few minutes," and left. *Id.* Upon his return, Heath instructed Veluzat that all meetings must be on the schedule. *Id.*

Following her "coaching" of Veluzat, Heath reported to Nock that Veluzat made several "hateful comments" about Demonbreun that she believed were "very inappropriate," including that he would "choke her ass." R. 35-8 (August 7, 2009 Heath Email) (Page ID #325); R. 35-8 (Aug. 19, 2009 Heath Notes) (Page ID #327). Veluzat emailed Nock after his coaching, complaining to Nock that Demonbreun "tattled" on him, that she was a "bully," and that she behaved "not unlike a petulant child." R. 35-1 (Aug. 14, 2009 Veluzat Email) (Page ID #208–09).

Nock forwarded Veluzat's email to Human Resources ("HR"). R. 35-1 (Aug. 18, 2009 Nock Email) (Page ID #208). HR Director Timothy Burton then engaged Veluzat in a "Performance Accountability Discussion." R. 35-9 (Burton Aff. at 1) (Page ID #336). A Performance Accountability Discussion is a "serious and planned discussion . . . about the

need to correct ongoing performance issues." R. 35-1 (Performance Accountability Policy at 2) (Page ID #192). Burton and Veluzat "discussed Mr. Veluzat's belief that he was not being respected by his peers." R. 35-9 (Burton Aff. at 1) (Page ID #336). Burton states that Veluzat did not raise the treatment of minorities during the discussion. *Id.*

Veluzat also received a Performance Accountability Discussion in February of 2010. R. 35-1 (Feb. 17, 2010 Memo at 1) (Page ID #223). Veluzat left work in the afternoon without telling his supervisors and entered his time as being "on-call." *Id.*; R. 47-1 (Veluzat Dep. at 158–59) (Page ID #677–78). Veluzat claims that he was on-call because he had his personal phone with him. *Id.* He also states that it was common practice for him not to inform his supervisors that he was leaving work. *Id.* The Performance Accountability Discussion also addressed Veluzat's further communication issues with co-workers and Veluzat's failure to train a new employee. R. 35-1 (Feb. 17, 2010 Memo at 1) (Page ID #223); R. 35-1 (Feb. 15, 2010 Veluzat Notes) (Page ID #216); R. 47-1 (Veluzat Dep. at 149) (Page ID #668). Veluzat believes the training issue was "contrived" because Nock did not give him any time to conduct training. R. 47-1 (Veluzat Dep. at 156) (Page ID #675).

On June 14, 2010, Veluzat was issued a "Memorandum of Accountability." R. 35-1 (Memo of Accountability at 1) (Page ID #231). According to WMC policy, a Memo of Accountability is issued if, after Performance Accountability Discussions, the employee "continues not to live up to the agreement made to correct performance." R. 35-1 (Performance Accountability Policy at 2) (Page ID #192). An employee who receives a Memo of

5

Accountability is not eligible to transfer to another position for twelve months. *Id.* at 3 (Page ID #193). Burton prepared Veluzat's Memo of Accountability. R. 35-8 (Nock Aff. at 2) (Page ID #322). The Memo primarily arose from two incidents.

First, Dr. Titus Daniels, a physician at WMC, complained to Nock about how Veluzat processed a pharmacy order. R. 35-1 (June 01, 2010 Daniels Email) (Page ID #228). Nock told Veluzat to "review" the order so that she and Veluzat could discuss it. *Id.* Veluzat responded by sending an email to Daniels in which Veluzat stated that he "polled several pharmacists" about his conduct and the other pharmacists agreed with Veluzat's handling of the order. R. 35-1 (June 08, 2010 Veluzat Email) (Page ID #229–30); R. 47-1 (Veluzat Dep. at 175) (Page ID #694). Veluzat's Memo of Accountability describes his email to Daniels as "inappropriate," and Burton claims that Daniels was "not happy" about the email. R. 35-1 (Memo of Accountability at 1) (Page ID #231); R. 47-4 (Burton Dep. at 27) (Page ID #926). Veluzat believes it was appropriate for him to send the email because he is "somebody who knows about the medications Dr. Daniels works with." R. 47-1 (Veluzat Dep. at 160–61) (Page ID #679–80). Second, pharmacist Angela Dyer contacted Nock about communication issues at a clinic that she blamed on Veluzat. R. 47-1 (Nock Aff. at 2) (Page ID #322); R. 35-1 (May 28, 2010 Dyer Email) (Page ID #226). Veluzat had also given Dyer's personal phone number to a patient, "in violation of WMC policy." R. 35-8 (Nock Aff. at 2) (Page ID #322); R. 47-1 (Veluzat Dep. at 171) (Page ID #690).

Veluzat does not believe that either Dyer or Daniels was retaliating against him in complaining to Nock. R. 47-1 (Veluzat Dep. at 169, 172) (Page ID #688, 691). He believes that,

"based on what other people were seeing and telling" him, including Kim Heath, Nock was "trying to establish a case" against him to have him fired. *Id.* at 178 (Page ID #697).

In June 2010, Veluzat was progressed to the final stage of WMC's disciplinary policy—a "Day of Decision"—because he disagreed with the Memo of Accountability and refused to sign it. *Id.* at 179–80 (Page ID #698–69); R. 47-4 (Burton Dep. at 32) (Page ID #931). Employees subject to a Day of Decision are given one day of paid leave in which they are to "complete a Statement of Commitment," promising "total commitment to fully acceptable performance." R. 35-1 (Performance Accountability Policy at 3) (Page ID #193). Employees subject to a Day of Decision are not eligible to transfer for eighteen months and are not eligible for pay increases for twelve months. *Id.* A Day of Decision is the final stage of disciplinary action prior to termination. *Id.*

Burton made the decision to progress Veluzat to a Day of Decision. R. 35-9 (Burton Aff. at 2) (Page ID #337). Veluzat claims that he told Burton in their subsequent meeting that he was trying "to protect patients and co-workers who have been . . . calling me crying because of the way [Nock has] talked to them because of the color of their skin." R. 47-1 (Veluzat Dep. at 181) (Page ID #700). Burton claims that Veluzat never expressed these concerns about Nock. R. 47-4 (Burton Dep. at 49) (Page ID #948).

On June 29, 2010, Veluzat chose to make a "Statement of Commitment," and committed to accept responsibility for his actions and improve communication with co-workers. *Id.* at 33 (Page ID #932); R. 35-1 (Statement of Commitment) (Page ID #233). After signing the

Statement of Commitment, Veluzat sent an eight-page email to Burton expressing his concerns about Nock's management style. R. 47-1 (Veluzat Dep. at 183) (Page ID #702); R. 35-1 (Veluzat Email) (Page ID #234–42). Veluzat did not raise concerns about Nock's treatment of minorities in his email. R. 47-1 (Veluzat Dep. at 184) (Page ID #703).

On October 27, 2010, Nock gave Veluzat a positive annual performance evaluation. R. 47-2 (Nock Dep. at 62–63) (Page ID #849–50). She noted that since his Day of Decision, Veluzat had improved communication. *Id.* at 63 (Page ID #850); R. 35-1 (Oct. 27, 2010 Performance Evaluation) (Page ID #204–06). Veluzat believes that Nock recommended him for a raise in 2010. R. 47-1 (Veluzat Dep. at 105) (Page ID #624). Veluzat admits that in years that raises were available, Nock always evaluated him such that he received a raise. *Id.*

Veluzat alleges that he made additional complaints in 2011 about the treatment of minority employees. First, Veluzat claims that Bean called him in tears to complain that she was "being bullied" by Demonbreun. *Id.* at 215–16 (Page ID #734–35). According to Veluzat, he told Bean that she needed to send an e-mail to Nock and that Bean could copy him on the e-mail. *Id.* at 216 (Page ID #735). Veluzat did not tell Nock about the statements, but he claims that he told Pruter. *Id.* at 217, 231 (Page ID #736, 750).[4] Second, Veluzat states that in 2011 he met with WMC Education Coordinator Pat Guy approximately ten days before Nock was supposed to submit performance evaluations. *Id.* at 192 (Page ID #711). Veluzat alleges that he told Guy

---

[4]Veluzat first alleged in deposition that Bean called him crying in 2009. *See* R. 47-1 (Veluzat Dep. at 215–16) (Page ID #734–35). He later clarified that the "smurf" incident happened in 2009 and it was 2011 when Bean called him crying. *Id.* at 229–30 (Page ID #748–49). His brief now implies that both incidents happened in 2009. *See* Appellant Br. at 13.

that he feared that Nock would "get even with [him]" in an evaluation of his performance. *Id*. Veluzat alleges that he also expressed to Guy his "concerns that it was a hostile environment for black and Hispanic employees." *Id.* at 193 (Page ID #712). Veluzat does not know whether Guy shared his comments with anyone else. *Id.* at 194 (Page ID #713). Third, Veluzat claims that he discussed Nock's treatment of minorities in his private discussions with members of an outside consulting firm that the hospital hired to conduct an evaluation of the pharmacy department. *Id.* at 242–47 (Page ID #761–66). According to a representative from the consulting firm, no WMC employee was identified "as the source of any specific information" presented in their report. R. 47-3 (Cole Dep. at 85–86) (Page ID #884–85).

Nock resigned from WMC in September 2011 and was replaced by Joanna Merritt. R. 47-6 (Merritt Dep. at 23) (Page ID #980). Veluzat states that he had an initial conversation with Merritt in which he told Merritt "how the employees, especially African American employees, had been given a hellish time at times" under Nock's management. R. 47-1 (Veluzat Dep. at 113) (Page ID #632). Veluzat alleges that Merritt "looked surprised" at his comment, and he claims that she stated that "this place needs more men" and was "kind of a nest of pit vipers." *Id.* at 114 (Page ID #633).[5]

---

[5]Veluzat describes three reports in his deposition that he does not discuss in his brief. First, in 2007, Veluzat alleges that he was asked by Julie Miller, WMC's Assistant Chief Operating Officer, to complete an evaluation of Nock. R. 47-1 (Veluzat Dep. at 237) (Page ID #756). Veluzat claims that he told Miller that "employees felt like [Nock] was treating them like children" and that "some of the African American employees were especially put off" because Nock required everyone to read minutes at staff meetings. *Id.* at 238 (Page ID #757). Veluzat thought "this is not how people should treat their employees, making them read like children, and especially black people" where "that's been used to discriminate against them." *Id.* at 239 (Page ID #758). He believed this was reminiscent of Jim Crow laws. *Id.* Second, in 2009, Veluzat claims to have "share[d] with [Nock] that [Bean] was having trouble with another employee," Joann Kolb, who had a problem with Bean's perfume. R.

No. 14-6495
*Veluzat v. Williamson Med. Ctr.*

In late September 2011, supervisor Haley Peel accused Veluzat of insubordination. *Id.* at 196 (Page ID #715); R. 47-6 (Merritt Dep. at 27–29) (Page ID #984–86). After "WMC experienced a shortage of a particular electrolyte," Peel ordered electrolyte from another hospital. R. 35-10 (Peel Aff. at 1) (Page ID #356). Veluzat disagreed and attempted to go against Peel's order through dietician Nancy Thomas. *Id.* at 1–2 (Page ID #356–57). Thomas reported Veluzat's actions to Peel. *Id.* Co-workers accused Veluzat of expressing that Peel was "not capable of making those decisions." R. 47-8 (Molyneux Dep. at 86–87) (Page ID #1115–16); *see also* R. 47-6 (Merritt Dep. at 30) (Page ID #987). Veluzat agrees that the incident occurred but he "didn't realize it was insubordination." R. 47-1 (Veluzat Dep. at 197) (Page ID #716).

Peel and Merritt met with Veluzat and Thomas about the incident. R. 35-10 (Peel Aff. at 2) (Page ID #357). Following this meeting, Peel "was not satisfied that Mr. Veluzat's conduct had received proper attention," and she "elevated [her] concerns to Human Resources." *Id.* at 3 (Page ID #358). HR became involved in the investigation, including Pat Guy and Phyllis Molyneux, Burton's replacement as HR Director. R. 47-6 (Merritt Dep. at 29) (Page ID #986);

47-1 (Veluzat Dep. at 233) (Page ID #752). Veluzat alleges that Nock made Bean wash her clothing, use a "back door to come in the pharmacy," and avoid Kolb. *Id.* Veluzat states that a different female employee then wore the same perfume to see Kolb's reaction, and that she was complimented by Kolb. *Id.* Veluzat "didn't really get involved" in the incident. *Id.* at 235 (Page ID #754). Nock states that Veluzat never approached her about the issue between Bean and Kolb. R. 47-2 (Nock Dep. at 53) (Page ID #840). Third, in 2010, Veluzat claims that he was approached by Andrea Goodsen, who complained that Nock "had talked to her about her appearance, her earrings and her hairstyle" even though Goodsen "didn't see anything that much different than other people of color's hairstyle and earrings, and dress." R. 47-1 (Veluzat Dep. at 224) (Page ID #743). Veluzat states that he "probably shared" this with Pruter, but that he did not share the comment with Nock. *Id*. at 224–25 (Page ID #744–45). Nock states that no one ever informed her of any complaints by Goodsen. R. 47-2 (Nock Dep. at 55) (Page ID #842).

R. 47-8 (Molyneux Dep. at 84) (Page ID #1113); R. 47-4 (Burton Dep. at 41) (Page ID #940). During this inquiry into Peel's complaint, Merritt learned of Veluzat's previous Day of Decision. R. 47-6 (Merritt Dep. at 34) (Page ID #991). The eighteen-month window of Veluzat's Day of Decision was still in effect. *Id.*

During HR's investigation, Thomas came forward to confess that "she was uncomfortable with something Mr. Veluzat had asked of her." *Id.* at 38 (Page ID #995). Thomas stated that Veluzat intended to attend a three-hour educational seminar, but it was canceled and rescheduled. *Id.* According to Thomas, Veluzat took the three hours off and told her: "you're going to have to cover for me on this one." *Id.* at 39 (Page ID #996). HR then approached Veluzat about the falsification of his time record. *Id.* at 40 (Page ID #997). Veluzat states that he "really didn't think [he] missed the class because [he] spent [his] time registering for it" and he claims that he did not modify his time card "because it was electronic." R. 47-1 (Veluzat Dep. at 201–02) (Page ID #720–21). Merritt and Molyneux met with Veluzat and told him of the allegation, and said that he could "provide proof that he had attended" the seminar. R. 47-6 (Merritt Dep. at 42) (Page ID #999). Veluzat alleges that he brought in a cancelled check and other documents to prove he eventually attended the seminar. R. 47-1 (Veluzat Dep. at 202) (Page ID #721).

Merritt and Molyneux made a "joint decision" to terminate Veluzat because he falsified his time card and because he had received another disciplinary infraction within the eighteen-month window of his Day of Decision. R. 47-6 (Merritt Dep. at 43) (Page ID #1000).

11

According to Merritt, both are grounds for dismissal, and she had "nowhere else to go with it" according to WMC policy. *Id.* Veluzat was terminated on November 1, 2011. R. 35-1 (Notice of Termination) (Page ID #245).

According to Veluzat, he does "not blame" Merritt for his termination. R. 47-1 (Veluzat Dep. at 189) (Page ID #708). Rather, he blames Nock and WMC "administration," namely Julie Miller and Peel. *Id.* at 189–90 (Page ID #708–09).

Veluzat filed his Complaint against WMC on November 27, 2012, alleging violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. R. 1 (Complaint at 1, 6) (Page ID #1, 6). The district court granted WMC's Motion for Summary Judgment on November 10, 2014, finding that Veluzat had failed to offer any evidence that WMC's non-discriminatory reasons for disciplining and terminating him were pretextual. *Veluzat v. Williamson Med. Ctr.*, No. 3:12-cv-01229, 2014 WL 5822859, at *8 (M.D. Tenn. Nov. 10, 2014).[6] Veluzat timely appealed. R. 100 (Notice of Appeal) (Page ID #1756).

## II. DISCUSSION

"We review de novo a district court's grant of summary judgment." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). Summary judgment "is appropriate only if, in viewing the evidence in the light most favorable to the nonmoving party, 'reasonable minds could come to but one conclusion, in favor of the moving party.'" *Imwalle v. Reliance Med.*

---

[6]The district court granted summary judgment in favor of WMC for both Veluzat's retaliation claim and his associational discrimination claim. *See Veluzat*, 2014 WL 5822859, at * 8. On appeal, Veluzat states that he "did not allege an Associational Discrimination claim in his Complaint" and that he "never stated a claim for Associational Discrimination." Appellant Br. at 23–24. Veluzat argues "one retaliation claim" on appeal, Appellant Br. at 24, and thus we will consider his claim as one of retaliation.

*Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Veluzat argues that WMC violated Title VII and § 1981 by disciplining and firing him in retaliation for his complaints about the treatment of minority employees. Title VII makes it unlawful for "an employer to discriminate against" an employee "because he has opposed any . . . unlawful employment practice . . . or because he has made a charge" that the employer engaged in a prohibited employment practice. 42 U.S.C. § 2000e-3(a). Section 1981 "guarantees that '[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens'" and "prohibits discrimination based on association with or advocacy for non-whites." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511–12 (6th Cir. 2009) (quoting 42 U.S.C. § 1981). "[W]e review § 1981 claims under the same standard as Title VII claims." *Id.* at 512.

Veluzat provides only circumstantial evidence of discrimination, and thus he must first establish a prima facie case of retaliation under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). Veluzat must establish that (1) he "engaged in a protected activity"; (2) WMC knew of his protected activity; (3) WMC subsequently took an "adverse employment action"; and (4) a "causal connection" exists between Veluzat's protected activity and WMC's materially adverse

13

action. *Id.* If Veluzat establishes a prima facie case, "the burden shifts to [WMC] to produce a legitimate, non-retaliatory reason for its action." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014). If WMC articulates a legitimate, non-discriminatory reason for its adverse employment action, "the burden shifts back to [Veluzat] to put forward competent evidence from which a reasonable jury could conclude that the stated reason is merely pretextual." *Id.*

Assuming that Veluzat has established a prima facie case of retaliation, WMC has offered legitimate, non-discriminatory reasons for Veluzat's discipline and termination. These include Veluzat's giving Dyer's personal phone number to a patient, Veluzat's "unprofessional email" to Daniels, his refusal to sign his Memo of Accountability, his insubordination towards Peel, and his submission of a false time record. The burden thus shifts to Veluzat to "demonstrate by a preponderance of the evidence that the legitimate reason offered by [WMC] was not its true reason, but instead was a pretext designed to mask retaliation." *Imwalle*, 515 F.3d at 544. Veluzat "can establish pretext by showing '(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his [discipline], or (3) that they were *insufficient* to motivate discharge.'" *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Veluzat has not put forward sufficient evidence to meet his burden.

First, Veluzat argues that he has created a genuine issue of material fact as to whether WMC's proffered reasons have a basis in fact. Appellant Br. at 34. Under this method of

establishing pretext, Veluzat can introduce evidence "that the proffered bases for the plaintiff's discharge never happened." *Chattman*, 686 F.3d at 349. We agree with the district court that Veluzat has not brought forward any such evidence. *See Veluzat*, 2014 WL 5822859, at *10. Veluzat claims that he disagrees factually about the falsification of his time card. Appellant Br. at 36. Veluzat argues that a "mistake" or "confusion . . . occurred over whether he attended a workshop." *Id*. This fails to raise a genuine issue of material fact as to whether the underlying conduct occurred: Veluzat admits that he did not attend the seminar and that he did not change his time card or alert his superiors. R. 47-1 (Veluzat Dep. at 200–01) (Page ID #719–20); R. 35-1 (Oct. 31, 2011 Veluzat Notes) (Page ID #250–51). Veluzat also cites his positive performance evaluation from Nock in 2010 and argues that he was "well qualified" for his position. Appellant Br. at 35. But this performance evaluation from Nock, which refers to his disciplinary history, *see* R. 35-1 (Oct. 27, 2010 Performance Evaluation) (Page ID #206), does not raise a genuine issue of material fact as to whether he committed the underlying conduct involved in the disciplinary actions taken against him. Accordingly, Veluzat has not pointed to any evidence that establishes WMC's non-discriminatory reasons have "no basis in fact." *Chattman*, 686 F.3d at 349.

Under the second category of evidence, Veluzat can admit that his "conduct *could* motivate dismissal," but can "attempt[] to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely" than the employer's explanation. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting

*Manzer*, 29 F.3d at 1084). Veluzat argues that he has established pretext because of the temporal proximity between the disciplinary actions taken against him and his reports to management. Appellant Br. at 37. But Veluzat has not put forward evidence sufficient to raise a genuine issue of material fact. Rather, Veluzat has only reiterated the sequence of events. *See* Appellant Br. at 36–39. He cites no other evidence in the record that establishes that WMC's motive was retaliation in response to his complaints about minority employees. In his opposition to WMC's Motion for Summary Judgment, Veluzat pointed to his testimony that Kim Heath told him "that Nock was trying to establish a case against him, and make a paper trail to get rid of him." R. 45 (Motion in Opposition to Summary Judgment at 37) (Page ID #511). But we agree with the district court that, even assuming that this is not inadmissible hearsay, Veluzat has pointed to no evidence that indicates that "Nock had any motive for wanting to 'get rid of' Veluzat beyond the reasons that support his disciplinary actions." *Veluzat*, 2014 WL 5822859, at \*10. Accordingly, even taking all evidence in a light most favorable to Veluzat, he has not brought forward evidence sufficient to raise a genuine issue of material fact under this method of establishing pretext.

To show pretext under the third category, a plaintiff generally presents "evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct" to that of the plaintiff. *Chattman*, 686 F.3d at 349. In his brief, Veluzat argues that Nock treated him "differently from similarly situated employees" in that she provided time on the schedule for other employees to provide

training, but did not provide him time to give training. Appellant Br. at 33. He also states that he was subject to "heightened scrutiny" for his minor infractions. *Id.* at 34. However, Veluzat has not attempted to present any evidence of another employee engaging in similar conduct and receiving different treatment. Accordingly, the district court correctly found that Veluzat failed to establish a genuine issue of material fact that WMC's proffered, non-discriminatory reasons were insufficient to justify his discipline and termination.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.