NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0389n.06

No. 20-4159

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 18, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| YERBRO TURNER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MCCULLOUGH-HYDE MEMORIAL HOSPITAL, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

**BEFORE: ROGERS, WHITE, and MURPHY, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiff Yerbro Turner was fired by Defendant McCullough-Hyde Memorial Hospital and brought this action alleging unlawful discrimination. The district court concluded that Turner failed to establish a prima facie case of race discrimination and could not show pretext.[1] Because we agree that there is no genuine dispute of material fact about whether McCullough-Hyde's proffered reasons for firing Turner were pretextual, we AFFIRM.

## I.

Turner, an African-American man, began working for McCullough-Hyde as an environmental service worker in 1983. He became a material handler/receiver and was eventually promoted to buyer. Until his final performance review, Turner received good evaluations, had no discipline or write-ups, and was known as a dedicated employee who took on projects outside of

---

[1] Turner does not appeal the dismissal of his age-discrimination claims.

his work duties. In 2015, McCullough-Hyde became affiliated with TriHealth, and Turner's title changed from buyer to purchasing specialist expeditor, with some change of duties. In December 2015, McCullough-Hyde eliminated Turner's position, along with several others, including his supervisor.

The organizational changes and layoffs resulted in some unfilled positions. Brian Krause, Vice President of Finance at TriHealth, emailed Ami Schlotman, Manager of Logistics, about filling open positions and asked if Turner had the skills for a position in logistics. Schlotman responded:

> Possibly. I think [his former supervisor] held him back. When Laurie trained him . . . [,] she said he was eager to learn and to do it right.
>
> My concern was just not seeing the initiative. But I have to think about how much was that him or him doing what his boss told him? I can't answer that from my limited interaction with him, but I do put a lot on what Laurie said. I think bringing him back in a role in the storeroom and not back in the office would be the best way to see if he can do what we need.

R. 11-2, PID 318.

Turner was re-employed on December 14, 2015 as a supply-distribution technician in the logistics department, a member of the central-supply team. His duties included unloading and delivering linens, filling supply carts, delivering equipment and supplies throughout the hospital, and inventory management. As is standard when hired in a new position, Turner was placed on a ninety-day probationary status. Turner's new direct supervisor was Carolyn Saunders, who reported to Schlotman. Turner had worked often with Saunders before she was his supervisor and "had no problems" with her. R. 8, PID 47. Other members of Saunders's team whom she supervised were Shannan Bowman, Paula Doan, and Jim Schmitt, all white. Saunders and Schlotman are also white. Turner was thus the only African-American employee in central supply, and one of only about five or six out of roughly 500 hospital employees.

As a result of the reorganization, there were some differences in job duties for logistics employees. For example, there was a new inventory system and a new linen vendor. Saunders described the difference in the new linen vendor's system as "day and night" compared to the old vendor's system. R. 12, PID 353-54. Linen was now delivered three days a week, instead of five, so that each delivery was larger and took longer to unload, sort, and deliver. The hospital also used different linens once it affiliated with TriHealth. Given the different types and quantity of linen, unloading it when it came in was a big job that required the central-supply employees to unload the linen from carts into a small storeroom. Saunders testified that she believed Turner avoided linen duties by going to lunch when the linen arrived. When she talked to him about it, she told him linen "takes us all to do," Turner replied "okay," and afterwards Turner would occasionally help with linen. *Id.* at PID 359-63. She estimated that, even after this conversation, Turner avoided linen duties once a week, but she does not think she had further discussions with him about it. Nor did she warn Turner that failing to help more with linen might cost him his job: "When you're on probation, you want to go above and beyond, at least until after your probation, I would think." *Id.* at PID 374. Bowman also testified that Turner avoided linen duties and would say that there were already too many people in the storeroom. Turner acknowledged that there were "some occasions" when he would not help with linen because there were multiple people already in the small storeroom. R. 19-2, PID 563. In those instances, he would complete other tasks. He says he was never told that he should work on linen before doing those other tasks.

Aside from linen, Saunders identified other issues with Turner's performance. She testified that Turner thought he knew everything because when she would ask him questions or try to explain things to him, he would respond, "Yeah, I know." R. 12, PID 364-65. This made him hard to train. Saunders recalled other instances where Turner performed a task incorrectly or where

she could not find him. But she acknowledged that "other employees that [she] trained . . . ha[d] similar times where they made a mistake and gave somebody the wrong thing or put something in the wrong spot." *Id.* at PID 398. Saunders acknowledged that Turner did some things well, and she "bump[ed] him up" whenever he did. *Id.* at PID 366. For example, Turner learned the new handheld inventory system, which she described as "a big accomplishment." *Id.* at PID 366. But she did not see any consistency with Turner. Saunders stressed that the central-supply team needed to work together to complete all the tasks each day, but she often observed Turner off by himself doing non-work-related things. She spoke to Schlotman several times about her impressions of Turner and told her that Turner had a lot to learn, thought he knew everything, and did not take the job seriously. Saunders did not have anything to do with the decision to fire Turner and does not recall speaking to Schlotman about Turner near the time when he was fired. She was not surprised that Turner was fired, however.

Bowman's impressions of Turner were similar to Saunders's. Bowman testified that she was not surprised Turner was fired because he did not "pull his weight" and did not seem like he wanted to be there. R. 16, PID 440. As examples, she testified that Turner often did not help with linen, seemed to be gone a lot, and was wasting time on a computer on at least one occasion. She shared her views about Turner with her coworkers and Saunders but does not recall any conversations with Schlotman about him.

Schmitt was less critical of Turner. He testified that he was glad Turner was hired. In his view, Turner was slow when he started, but so were Bowman and Doan. Although Schmitt thought that Turner was somewhat unmotivated because Turner would check emails before completing other tasks that Schmitt considered to be higher priority, he could not recall Turner failing to get his work done.

Schmitt testified that he could not remember ever speaking with Schlotman about Turner. Nor could he recall speaking with Saunders about Turner, other than one incident where he overheard Turner talking to another employee about Turner's wages.[2] Schmitt also found Turner's paystub on a printer and took the paystub home with him. After Schmitt spoke to Saunders about Turner's discussing his pay, Schlotman and an HR representative met with Turner and told him that discussing his wages with other employees in an open location is inappropriate. Turner denied doing so.

Schlotman met with Turner about other issues too. In two separate meetings, Schlotman discussed with Turner the lunch policy because Turner had taken an hour-long lunch—lunches were supposed to be thirty minutes—off campus without getting permission. Turner denied leaving without permission and testified that he informed Saunders he was leaving for lunch; although she was on the phone, Turner knew that she understood because she nodded. Turner acknowledged that he took an hour for lunch even though lunch was supposed to be thirty minutes, but he told Schlotman she could reduce his pay for the extra half hour.

Additionally, Schlotman discussed with Turner the importance of his communicating where he is and what he is doing, and noted that she had to call his cell phone to find him.[3] Schlotman testified consistently that she had to call Turner "a couple of times" because she could not find him in the storeroom or in the receiving area. R. 11, PID 304. She did not call the other central-supply employees because she could usually find them, although she may have texted Schmitt once with a question when she was unable to find him.

---

[2] However, Schmitt testified that Saunders may have been present when he had "general BS" discussions about Turner taking lunches that were longer than the allotted thirty minutes. R. 17, PID 533-34.

[3] There was a dispute in the district court about whether materials authenticated by the affidavit of Turner's counsel were admissible, including an email summarizing this meeting. McCullough-Hyde does not maintain its objection to considering these materials on appeal, and both parties rely on some of these materials in their arguments.

Turner testified and submitted a declaration stating that he was never given negative feedback from Saunders, always followed directions, did not routinely use the computer to look up information that was not work-related, and always completed his work. He also stated that Bowman and Saunders took frequent smoke breaks before daily tasks were complete, and that Bowman and Doan often used the computer for non-work-related purposes such as online shopping or listening to music.

Fifty-nine days into his probationary period, Schlotman gave Turner his "90 Day Performance Analysis." R. 8-6, PID 130. The analysis form listed nine objectives with possible ratings of exceptionally effective, effective, or less than effective. Schlotman rated Turner as less than effective in six categories (results orientation; problem solving and innovation; customer service; working relationship with others; communication; and quality of work), and effective in three (flexibility; stewardship/attendance and punctuality; and job-related skills and knowledge). She provided a narrative for each objective that identified deficiencies in Turner's performance:

> Results orientation: . . . When put to task on his own [Turner] would go to the assigned area and determine himself if he was needed for a task or not, rather than follow instructions from [Saunders] to complete tasks in an assigned area, examples being linen and receiving.

> Problem Solving and Innovation: When working on tasks [Turner] asked questions of [Saunders] or his peers, one specific example was about a storeroom return of a very expensive item, some of which arrived, and some that was on backorder. In response to his question, [Saunders] advised him to . . . cancel the remaining items on backorder. [Turner] did not follow the instructions and waited for the rest of the product to arrive before completing the return. When working par cart orders, [Turner] was having issues running [a] report. [Schlotman] was in the vicinity and overheard the issue and [Turner] stating that the system and his access were not right and he would have to call the Corporate team. [Schlotman] asked [Turner] to show her how he was running the report. Upon observation it was discovered that [Turner] had not created the job and was not inquiring correctly. [Schlotman] set up the job and walked [Turner] through the process, asking him to complete each step. This example shows jumping to conclusions rather than seeking answers to proactively solve the issue.

Flexibility: When asked to do tasks [Turner] has followed instructions and moved between assignments. An observation has been that if there are multiple staff in that area [Turner] has taken it upon himself to determine he is not needed and leave the assignment with no communication to leadership.

Customer Service: . . . During training it was observed by [Saunders] that [Turner] was clear he already knew about things and processes and was not receptive to listening to or re-learning about them as a refresher, examples being linen items. [Schlotman] observed this as well when upon arrival one day . . . [Turner] was in the receiving office filing, and she questioned him about how the par carts and orders were going, and he was unable to provide an answer.

Working Relationship with Others: Observations from [Saunders] have shown that [Turner] is not the most motivated in a team environment. If instructed to go learn/complete a task, if there were others in the area currently doing it, he would not join in, but determine he was not needed and move on to another task without communicating what he would be doing or where he would be. On at least 2-3 occasions [Schlotman] had to call his cell phone to find him or leave him a voicemail requesting him, and [Saunders] reported having similar issues locating [Turner].

Communication: . . . It was observed and brought to [Turner]'s attention that he needed to be more vocal about what he was doing and where he was going, as well as he was encouraged to leave notes if no one was available . . . . There were also conversations about the 30 minute lunch (per policy) and the department's expectations about returning and not going off campus. It was also observed that [Turner] was at lunch for over 30 minutes in the lunch room on various occasions.

Stewardship/Attendance and Punctuality: [Turner]'s arrival and departure, as well as consistency with attendance has been acceptable . . . . We have had conversations about communicating lunches, and length of lunch. It was shared that assumptions should not be made and that permission should always be obtained. When you are not able to be located by [Saunders] or [Schlotman] because you have not communicate [sic] what work task you are completing while on the clock, you are not being responsible and resourceful [sic] of hospital resources (your time).

Job-Related Skills and Knowledge: The job responsibilities are different than previous roles that [Turner] has held. . . . [Turner]'s assumption that he knows the job responsibilities has lead [sic] him to not ask as many questions as he might in a new environment and he has not been as open to feedback and learning as one would expect when taking on a new role and learning the skills.

Quality of Work: To learn the job you need to be open and receptive to the job responsibilities . . . . One must be willing and open to communication and not defensive when feedback, constructive criticism, and direction are given. It is not acceptable to be told or asked to go and complete a task, and then determine yourself that you are not needed due to the others already doing the task. It is not

> acceptable to be on the clock and have [Schlotman] or [Saunders] have to call your cell phone because you did not communicate to anyone where you would be or what you would be doing.

*Id.* at PID 130-31. As a result of these issues, Schlotman and an HR representative met with Turner and terminated his employment effective immediately. Schlotman explained that she fired Turner before the end of the ninety-day probationary period because there was no sense in "string[ing] him along [for] the full 90 days" when it was clear that he "wasn't adequately meeting what we needed in the role." R. 11, PID 298.

Turner filed a charge of discrimination with the EEOC. After receiving his right-to-sue letter, Turner filed suit against McCullough-Hyde alleging age and race discrimination under federal and Ohio law. The district court granted summary judgment to McCullough-Hyde, concluding that Turner did not meet his burden to establish a prima facie case or pretext. Turner now appeals the dismissal of his race-discrimination claims.

## II.

We review de novo a grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party—here, Turner—and drawing all reasonable inferences in his favor. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (citations omitted). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Race-discrimination claims brought under Ohio law are analyzed under the same framework as Title VII claims. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Because Turner relies on circumstantial evidence of discrimination, his claims are analyzed under

the *McDonnell Douglas*[4] burden-shifting framework. *Rogers*, 897 F.3d at 771. Under that framework, Turner must first make out a prima facie case of race discrimination before the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* at 772. If the employer meets this burden of production, "the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual." *Id.* (internal quotation marks and citation omitted). We will assume, for purposes of this appeal, that Turner met his burden to establish a prima facie case.

Turner does not contest that McCullough-Hyde articulated a legitimate, nondiscriminatory reason for terminating his employment, i.e., the reasons listed in his performance evaluation. The burden thus shifts back to Turner to present a genuine dispute of material fact that the justifications proffered by McCullough-Hyde were pretext for race discrimination. *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).

> Plaintiffs typically show pretext in one of three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action. But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not? So plaintiffs remain free to pursue arguments outside these three categories. Even so, a plaintiff must articulate some cognizable explanation of how the evidence she has put forth establishes pretext.

*Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (internal quotation marks and citations omitted). Turner argues that he has presented evidence that adequately disputes the factual basis for some of the proffered reasons for his termination and that others were insufficient to motivate his termination or did not actually motivate his termination.

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Schlotman claimed responsibility for the decision to fire Turner. Schlotman oversaw other facilities besides McCullough-Hyde, so she was not at McCullough-Hyde every day. Still, she testified about several of her own observations of Turner to support her termination decision, some of which were corroborated by contemporaneous emails. These issues involve Turner's incorrectly running a report and not contacting Schlotman about how to run that report, Turner's being defensive when accused (wrongly, according to Turner) about not communicating his lunch plans, not being able to find Turner, and Turner's filing when he should have been completing other tasks.

In addition to her own observations, Schlotman testified that she relied on feedback from Saunders and Schmitt in preparing the performance evaluation. As Turner points out, however, Schmitt denies ever speaking with Schlotman about Turner and denies speaking with Saunders more than the one time concerning Turner's discussing his wages with a coworker. A reasonable jury could, therefore, disbelieve Schlotman's testimony about her reliance on Schmitt. However, nothing in the performance evaluation or Schlotman's testimony was supported solely by purported comments from Schmitt. Schlotman testified that Schmitt voiced concerns to her "about not being able to find [Turner] and just, you know, working as a team." R. 11, PID 291. But, these asserted comments echo concerns voiced by Saunders (and Bowman) or observed by Schlotman herself.

Saunders's testimony is more problematic for Turner. Saunders testified that she spoke with Schlotman often about her department. And she had generally negative impressions of Turner that she shared with Schlotman. In her deposition, she was asked how she would have rated Turner in the performance evaluation, and she responded with similarly low marks based on similar issues identified by Schlotman. She was also not surprised that Turner was fired.

Turner argues that he presented sufficient evidence of pretext despite Saunders's testimony. First, he points out that Saunders testified that she had nothing to do with the termination decision and cannot recall if she spoke to Schlotman about the decision to fire Turner. He also argues that Saunders only recalled one specific time that Turner tried to avoid linen duties, which was when he asked to leave early on Christmas Eve. According to Turner, this testimony is directly contradicted by Turner's timesheet because the timesheet shows that Turner took PTO for the entire day on Christmas Eve, and thus nothing supports Saunders's opinion that Turner avoided linen duties except her subjective perceptions. Turner asserts that, as a result, a reasonable jury could conclude that Saunders's entire testimony is not credible.

Turner misconstrues Saunders's testimony. Although Saunders denied having input in the termination decision, she spoke to Schlotman often about her department and conveyed her negative impressions about Turner to Schlotman. Further, Saunders testified that Turner avoided linen duties "[a]s often as he could," and "[p]robably" once a week even though she told him the importance of working as a team on the linen. R. 12, PID 362. Regarding Christmas Eve, Saunders testified that she discussed with him the importance of teamwork on that day because he asked to go home before the linen tasks were completed. Although Turner is correct that his timesheet reflects that he took PTO all day on Christmas Eve, this was not, contrary to Turner's argument, the only time Saunders recalled Turner's ever shirking linen duties.[5] Even drawing every reasonable inference in Turner's favor, the conflicting evidence about Christmas Eve does not render Saunders's testimony unreliable or propped up only by subjective and vague assessments of Turner's performance.

---

[5] Although not discussed by McCullough-Hyde, it appears that Turner left early on New Year's Eve, around 2:30 pm, i.e., after linen duties would have been completed.

Turner also argues that each of the bases listed in the performance evaluation either did not occur or were insufficient for his discharge. First, Schlotman listed under several categories Turner's not helping with linen and instead determining himself that he was not needed. As discussed above, Turner does not dispute that he sometimes did not help with linen but argues that this decision was justified because the storeroom was small. He also points out that Schmitt sometimes did not help with linen because of his other job duties but was not fired. Saunders testified, unrebutted, that Schmitt was primarily responsible for receiving so would sometimes not be able to help with linen because of supply trucks arriving at that time. Because Schmitt's duties differed from Turner's, comparing his occasional failure to help with linen does not show pretext. *See Miles*, 946 F.3d at 893 (explaining that a plaintiff can show pretext by presenting evidence that other employees outside the protected class engaged in "substantially identical conduct" to the conduct that motivated the plaintiff's discharge or discipline (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012))). Saunders testified that Bowman and Doan assisted with linen every time, and she expected Turner to as well. Given these undisputed facts, Turner has not presented a genuine dispute that citing his failure to assist with linen is pretext for unlawful discrimination. *Cf. Chattman*, 686 F.3d at 349-50 (finding sufficient evidence of pretext where there was evidence that management knew that the plaintiff's coworker was not injured from the horseplay incident and therefore the plaintiff's horseplay was no more severe than horseplay engaged in by other employees).

As to Schlotman's statements that Turner did not follow directions, Turner argues that this is disputed by Schlotman and Saunders's own testimony because they both testified that when they instructed Turner to do something, he would do it right away, and there is evidence that Turner never failed to complete his daily tasks or deliver supplies to the correct department. Saunders

testified that she does not recall Turner's ever "flat out refus[ing] to follow instructions . . . to complete tasks," R. 12, PID 370, and that when Turner did something wrong, he would fix it if the problem were pointed out to him. Schlotman likewise testified about an incident where Turner followed her instructions, i.e., when she saw Turner filing but told him that he should complete other tasks first. Viewing the evidence in his favor, this testimony supports Turner's argument that he generally followed instructions when he was told to do something. But, in addition to linen, discussed above, Schlotman gave an example of Turner's not following instructions by not canceling a backorder. Turner did not testify about this incident. Although Saunders did not recall this incident specifically, she testified that she "[p]robably" instructed Turner to cancel a backorder. *Id.* at PID 371. Schlotman recalled the incident in her testimony, but she did not testify one way or the other whether Turner failed to follow directions.

Regarding the references to Schlotman or Saunders calling Turner on his cell phone because they could not locate him, Turner does not contest that Schlotman called him, but argues that there is a dispute of fact as to whether he was treated differently than his peers. As Turner points out, part of the central-supply team's duties involved delivering supplies, so it was not uncommon for them to be completing tasks around the hospital. Turner, therefore, argues that Schlotman singled him out by calling him but not others, and then held her own choice against him. Turner's argument is not supported by the evidence. Although the deposition testimony did not go into detail about these instances, Schlotman explained that she called Turner when she was not able to find him in the storeroom or in the receiving area but never had to call the other employees because "[u]sually, they would be in the storeroom." R. 11, PID 305. Turner was not aware of any instances when Schlotman was not able to locate his coworkers. Schlotman thought there was one time when she could not find Schmitt because he was in the operating room, and on

that occasion she texted him with her question. Although Saunders did not know whether she called Turner's cellphone to locate him, she testified, in explaining why she would rate Turner as less than effective in communication, that a few times "he'd tell you where he was at or where he was going and you'd go there, he might not be there." R. 12, PID 401. The evidence in the record, therefore, does not support an inference that Schlotman singled Turner out for differential treatment by calling his cellphone when she could not locate him.

Another example Schlotman gave in the performance evaluation involved an incident where Turner was incorrectly running a report. Schlotman used this as an example of Turner's "jumping to conclusions rather than seeking answers to proactively solve the issue." R. 8-6, PID 131. The performance review states:

> When working par cart orders, [Turner] was having issues running [a] report. [Schlotman] was in the vicinity and overheard the issue and [Turner] stating that the system and his access were not right and he would have to call the Corporate team. [Schlotman] asked [Turner] to show her how he was running the report. Upon observation it was discovered that [Turner] had not created the job and was not inquiring correctly. [Schlotman] set up the job and walked [Turner] through the process, asking him to complete each step. This example shows jumping to conclusions rather than seeking answers to proactively solve the issue.

*Id.* at PID 130-31.

Turner argues that the facts Schlotman relied upon do not show that he was jumping to conclusions and that, in the moment, Schlotman told Turner that reaching out to the corporate team was good, which raises an inference of pretext. To support his argument that Schlotman told him reaching out to the corporate team was good, Turner cites an email from Schlotman to Saunders discussing what appears to be a similar incident, where Schlotman stated: "I asked if he had anything else and he said he had called Katherine about the WH222, I said good. I also said, if I'm on site, please ask me as well, I can offer help. He said [Saunders] said to call, and I said, follow her instructions." R. 19-1, PID 545. Schlotman, however, was not asked about this email

in her deposition, and it is not clear whether this is referring to the same incident. The incident described in the email apparently involved a WH-222 report, whereas the incident listed in the performance evaluation involved a WH-130 report. (The meaning of these codes is not explained, other than that a WH-130 is "a report you run to receive requisitions." R. 12, PID 368.) Schlotman further testified about the incident described in the performance evaluation and explained that Turner had not properly built the report and that Turner should have reached out to her with questions because she was nearby. But she also testified that it was not necessarily a problem to call the corporate team, and that going forward, Turner had no similar issues. A reasonable jury could conclude based on this testimony that this was a minor issue that would not justify termination of Turner's probation, although the statement in the performance evaluation that he "jump[ed] to conclusions" is not without a basis in fact.

Schlotman also criticized Turner in his performance evaluation for not being open to feedback, not asking as many questions as he should, and being defensive. Turner argues these reasons are pretextual because Saunders testified that when a mistake was pointed out to Turner, he would correct it and apologize; that Bowman and Schmitt testified that Turner would ask them questions; that Schlotman described receiving feedback about Turner (prior to hiring him) that "he was eager to learn and to do it right," R. 11-2 PID 318; that the only supporting evidence of Turner's defensiveness is a conclusory perception from Schlotman; and that Turner denies not being open to learning new tasks. Turner is, in some respects, correct in his characterization of the record, and a reasonable jury could find that he did some things well. But Saunders explained her perception that Turner was difficult to train and was not open to feedback. She testified that, "When I would ask him a question, he'd say, 'Yeah, I know'" or when she "would try to explain things to him, . . . he'd already know." R. 12, PID 364-65. Saunders explained that "he knew the

15

McCullough-Hyde way, but he didn't know the TriHealth side of it because things [had] changed," *id.* at PID 364, so she would tell him, "[t]his is different, you've got to learn this," *id.* at PID 365. Consistent with these observations, Saunders told Schlotman she believed Turner did not take the job seriously and was hard to train because he thought he already knew everything. And as discussed below, Schlotman's reliance on Turner's direct supervisor's perception of Turner's performance does not raise a genuine dispute regarding pretext in this case.

Finally, Schlotman listed the one-hour lunch Turner allegedly took without receiving permission, and that he had been observed on various occasions taking lunches longer than thirty minutes. Turner denies that he left campus without permission but admits that he took a one-hour lunch. He does not dispute that Schmitt observed him taking more than a half hour for lunch on other occasions or that Schmitt may have mentioned this around Saunders. He argues that the one-hour-lunch incident as a basis for termination is pretextual because Schlotman's reaction at the time was that she was unsure of the policy, and that once she communicated it to him, there was never a problem. Schlotman testified that she was unsure whether Turner could use his PTO for the extra thirty minutes. But she and Turner were both aware that lunch was a half hour. And, based on Schmitt's unrebutted testimony, Turner took over a half hour for lunch on more than that one occasion.

For most of these issues, Turner does not dispute the underlying factual basis but argues that these issues were insufficient to motivate the decision to shorten his probationary period and terminate his employment. To show pretext in this way, a plaintiff usually is required to "show by a preponderance of the evidence that 'other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [the plaintiff].'" *Blizzard v. Marion*

*Tech. Coll.*, 698 F.3d 275, 286-87 (6th Cir. 2012) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)); *see Chattman*, 686 F.3d at 349. As compared to the prima facie stage, meeting this standard at the pretext stage requires an even closer correlation between the plaintiff and his comparators. *See Miles*, 946 F.3d at 893-94.

Turner does not meet this standard. As set forth above, Turner has not presented sufficient evidence that his comparators avoided linen duties as he did. This deficiency was consistently addressed in testimony from Schlotman, Saunders, and Bowman, and was highlighted several times in Turner's performance evaluation. Other issues that are not rebutted include taking long lunches and not communicating his whereabouts. In comparison, the evidence of Turner's coworkers' performance issues is limited to Saunders's acknowledgement that other coworkers made mistakes sometimes, Schmitt's statement that Bowman and Doan were slow like Turner when they first started, and Turner's affidavit stating that Bowman and Doan would shop online or listen to music at work. This limited evidence is not comparable to the issues identified by Saunders and Schlotman. *See Blizzard*, 698 F.3d at 287 (finding that the plaintiff failed to show pretext because her comparator did not have the same severity or frequency of errors despite, like the plaintiff, also inputting vendor information incorrectly into the payment system).

Although Turner also cites declarations describing him as a dedicated, hard-working employee, these declarations were based on observations made prior to his transfer to the central-supply team and were from individuals who did not work with him in central supply during the relevant period. Declarations of this nature are insufficient to show pretext in this case. *See id.* at 285 ("Blizzard also relies on a letter of reference written by Heisel on August 4, 2006, which described Blizzard as 'hard working,' 'dedicated,' and 'productive.' Unlike [other employees who testified favorably about Blizzard], Heisel did work in the Business Office alongside Blizzard.

However, Heisel left the Business Office in 2005, so his recommendation letter was based on an opinion of Blizzard's work formed over a year before the implementation of the new software that precipitated most of her performance issues. In short, this evidence does not establish that MTC's stated reasons were pretext for a discriminatory decision.").

    The parties also disagree about whether the honest-belief rule applies here.

> This court has adopted a modified honest belief rule, which provides that for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. The employee, in turn, must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is too obvious to be unintentional. To overcome the employer's invocation of the honest belief rule, the employee must allege more than a dispute over the facts upon which the discharge was based. He must put forth evidence which demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.

*Blizzard*, 698 F.3d at 286 (internal quotation marks, citations, and alterations omitted); *see Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707-08 (6th Cir. 2006) (explaining the modified honest-belief rule as, "so long as the employer honestly believed in the proffered reason, an employee cannot prove pretext even if the employer's reason in the end is shown to be mistaken, foolish, trivial, or baseless," provided the employer can "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made" (internal quotation marks and citations omitted)). Turner's primary challenge to Schlotman's termination decision is that the proffered reasons were insufficient to motivate the discharge. To show pretext in this way, the underlying factual basis is ordinarily not in dispute, and thus the honest-belief rule's applicability is not apparent. But as to a few of the proffered reasons, Turner argues that there is evidence disputing the factual basis. This includes critiques that he did not follow directions, was unmotivated or unreceptive, and did not seek permission from Saunders before leaving the hospital for lunch.

Turner argues that McCullough-Hyde is not entitled to benefit from the honest-belief rule because it conducted no pre-termination investigation, much less a reasonably thorough one. Turner points out that Schlotman's claimed investigative steps were discussing Turner's performance with Saunders and Schmitt, but that Schmitt denies ever speaking with Schlotman about Turner, and Saunders recalled in her deposition only general discussions with Schlotman. In support, Turner relies on *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 654 (6th Cir. 2015), where we concluded that the honest-belief rule did not aid the employer because a "reasonable jury could find that ConMed's belief in the reason for Yazdian's termination was not honestly held because ConMed did not investigate Yazdian's discrimination complaint and blindly followed [Yazdian's supervisor's] recommendation to terminate Yazdian." In *Yazdian*, the decisionmaker did not interview the plaintiff, his co-workers, or past managers to determine the correctness of the plaintiff's supervisor's allegation that the plaintiff had serious behavioral issues, and the plaintiff had indicated that he intended to respond to the allegations and file a discrimination complaint against the supervisor whose account he was disputing. *Id.* Rather than wait for these materials, the company fired him. *Id.*

The circumstances here are not similar. Schlotman observed some of the deficiencies herself, and others were reported by Saunders. Schlotman testified that she relied on Saunders in writing the performance evaluation, and many of the issues noted in the performance evaluation referred to Saunders. Saunders also testified that she talked to Schlotman often about the department and discussed Turner's performance with her. Further, Schlotman documented several instances where she discussed Turner's performance with him, including the one-hour lunch incident and his failure to communicate his whereabouts. Under these circumstances, *Yazdian* is distinguishable.

*Blizzard* is more analogous. In *Blizzard*, the employee received a performance review in 2006 that she disputed. 698 F.3d at 282. Blizzard also complained in 2006 and 2007 that her supervisor was treating her differently than younger workers. *Id.* at 281. In 2008, Blizzard's supervisor wrote a memo documenting reasons for termination, apparently based on similar performance issues previously identified, and the employer fired her three days later. *Id.* at 282. We rejected Blizzard's argument that the employer was not entitled to the benefit of the honest-belief rule for failing to investigate the charges to determine their veracity.

> However, it is not necessary that the decisional process used by the employer be optimal or that it left no stone unturned. Blizzard has failed to produce evidence demonstrating that MTC's reliance on the facts before it at the time of the decision to dismiss her was unreasonable. Lacking such proof, Blizzard's disagreement with MTC's honest business judgment regarding her work does not create sufficient evidence of pretext in the face of the substantial evidence that MTC had a reasonable basis to be dissatisfied. MTC is entitled to the protections of the honest belief rule because it has shown that it made a reasonably informed and considered decision to terminate Blizzard's employment. Thus, Blizzard has failed to establish pretext on the grounds that MTC's proffered reasons had no basis in fact.

*Id.* at 286 (alteration, internal quotation marks, and citations omitted); *see also Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012) ("However, as we have already noted, an 'optimal' investigation—i.e., interviewing the employee and some or all of his witnesses—is not a prerequisite to application of the honest belief rule."). Consistent with *Blizzard*, we conclude that McCullough-Hyde's decision was reasonably informed, and therefore Turner failed to establish pretext on the basis that McCullough-Hyde's proffered reasons had no basis in fact.

Next, Turner argues that Schlotman's termination decision is subject to closer scrutiny because it was supported primarily by subjective views of Turner's job performance that exhibited signs of negative racial stereotypes that "African Americans [are] lazy, uppity, or aggressive." Appellant's Br. at 48. As we have explained, "subjective evaluations by the employer—at least where contested by the employee—require close examination because they have a greater

susceptibility for being a smokescreen for pretext." *George v. Youngstown State Univ.*, 966 F.3d 446, 467 (6th Cir. 2020) (citations omitted). Further, evidence that the employer harbored racial animus can suffice to establish pretext because it allows a jury to infer that race discrimination was the true reason for the discharge. *See Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008).

Some of the comments read in isolation could be construed as unsupported by specific facts or based on negative racial stereotypes. These include Saunders's testimony that she "could just tell that he didn't want to be there," "he felt he already knew everything," and that she "didn't think he took [the job] serious," R. 12, PID 352, 399; Bowman's testimony that she got the "vibe" that Turner "did not want to be there" and "[w]asn't eager to help," R. 16, PID 444-45; or Schlotman's statement that she was "just not seeing the initiative" in Turner even though she had only limited interactions with him when she said that, R. 11-2, PID 318. But in context of the witnesses' testimony and record as a whole, these statements were adequately supported by the witnesses' observations of specific instances—in other words, these subjective conclusions were reasonably based on objective facts, including many discussed above—and cannot be said to reflect discriminatory animus.

Saunders explained her perceptions that it seemed like Turner "didn't want to be there" "felt he already knew everything," and that he did not "take it serious," by Turner not assisting with linen, going to the computer to perform non-work-related tasks[6] while the other employees were working as a team to complete the day's work, and responding "Yeah, I know," when she would explain how to do something. R. 12, PID 352, 364-65, 399. Bowman stated that she got the vibe that Turner did not want to be there and was not eager to help but initially declined to say more because she did not "want to hurt [Turner]'s feelings." R. 16, PID 444-45. When pressed

---

[6] Turner does not dispute this testimony. His declaration merely states that he did not "routinely" use the computer for non-work-related tasks.

further, however, Bowman explained that Turner was gone a lot and often did not help with linen. And Schlotman's statement that she was not seeing the initiative in Turner was made in response to an email inquiring whether Turner should be hired in the logistics department. In making that observation, Schlotman noted that it was possible that his former boss may have been holding him back, and that according to another employee Turner was eager to learn and do things right. She ultimately recommended hiring him in the position. It is not apparent how any of these comments viewed in context betray hidden discriminatory animus. *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam) (holding that a plant manager's reference to an African American as "boy," even without any racial modification, may be evidence of discrimination if factors including "context, inflection, tone of voice, local custom, and historical usage" support such a finding).[7]

Turner has persuasively argued that the facts viewed in his favor could allow a reasonable jury to find that terminating him was unfair or premature. He was a long-term employee who had performed well in his three decades at the hospital. Further, many of the issues identified by Schlotman appear to be relatively minor or are issues that Turner could have fixed if Saunders or Schlotman had let him know that his job was on the line if he did not improve. But regardless of the wisdom of the employer's termination decision or its approach to training its probationary employees, we cannot conclude based on the evidence here that a reasonable jury could find that McCullough-Hyde's decision was a pretext for race discrimination.[8]

---

[7] McCullough-Hyde argues that Schlotman was the person who hired and fired Turner and therefore any "claim of pretext is further belied by the same-actor inference." Appellee's Br. at 41; *see Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572-74 (6th Cir. 2003) (en banc) (discussing the same-actor inference). Given our conclusion that Turner failed to establish pretext even without applying the same-actor inference, we need not consider this argument.

[8] Turner offered no evidence of McCullough-Hyde's differential treatment of other probationary employees with similar performance issues.

For example, in *Johnson v. Kroger*, where the employee was also fired for purported performance issues, the employee introduced "the testimony of many of his coworkers in support of his contention that Kroger treated him differently than Caucasian comanagers"; evidence that he "fulfilled his responsibilities as well as Caucasian comanagers who had not been reprimanded, much less discharged"; evidence that his supervisor's "concern that having an African-American comanager would have an adverse effect on the Wheelersburg store's business"; testimony from several employees that his supervisor told them to "cease telling racial jokes, and that some employees at the location had made racial slurs in the past"; and testimony from other employees that his supervisor "refused to mentor or train [him], and instead ignored him," "did not introduce [him] to department heads, criticized him in public, and blamed him for errors that occurred in areas that were the responsibility of other employees." 319 F.3d at 866-68. We explained:

> This is admittedly a close case. We are of the opinion, however, that Johnson has presented sufficient evidence to enable a reasonable jury to conclude that Johnson would not have been discharged but for his race. Kroger, on the other hand, has produced substantial evidence that Johnson lost his job because he was not performing effectively. But the ultimate decision of whether Kroger's proffered reason for discharging Johnson was legitimate or only a pretext intended to hide racial discrimination is a matter for the jury to determine. Based upon the record before us, we are of the opinion that the issue cannot be decided as a matter of law.

*Id.* at 869.

Unlike in *Johnson*, there is no evidence here of any racially insensitive remarks—Turner testified that no manager or supervisor, including Saunders and Schlotman, ever made discriminatory or negative comments about his race—no evidence that Turner's coworkers had similar performance issues to Turner, and no similar evidence of differential treatment. And, like in *Johnson*, McCullough-Hyde has presented substantial evidence, corroborated by Turner's coworkers and direct supervisor, that Turner was not meeting Saunders's and Schlotman's

standards, even if their standards were arguably set too high. If *Johnson* was a close case creating a jury question about pretext, this case falls on the other side of that line.

We AFFIRM the district court's judgment.